AO 106 (Rev. 04/10) Application for a Search Warrant

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia ▼

AUG 25 2022

JULIA C. DUDLEY, CLERK
BY: /s/ C. Meade
DEPUTY CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No. 2:22mj17
Stored electronic data contained in a black Flip Phone )
belonging to Robert WARR (presently in the possession )
of the Lee County Sheriff's office). )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the   Western   District of   Virginia   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Distribution of a Schedule I & II Controlled Substance |
| 21 USC 846 | Conspire to Distribute Schedule I & II Controlled Substances |

The application is based on these facts:
See Attachment "C"

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Stephen Levesque*
Applicant's signature

Stephen Levesque, Special Agent, ATF
Printed name and title

Sworn to before me and signed in my presence.

Date: 8/25/22

City and state: Abingdon, VA

*/s/ Pamela Meade Sargent*
Judge's signature

Pamela Meade Sargent, U.S. Magistrate Judge
Printed name and title

## ATTACHMENT A

The property to be searched is a Black Flip Phone (Pictured below) that was located by law enforcement officers in Robert WARR's possession, hereinafter "the target device". The target device is currently located at the Lee County Sheriff's Office, which is within the Western Judicial District of Virginia.

This warrant authorizes the forensic examination of the target device and stored electronic data contained therein for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

1. All data on the target device described in Attachment A that is evidence of violations of Title 21 U.S.C. § 846 and § 841(a)(1) involving Robert WARR and suspected co-conspirators, known and unknown, including:

   a. lists of customers or suppliers, their phone numbers or social media identifiers, and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. Text messages or third party application data, including photographs or videos, relating to the distribution of controlled substances, and any conspiracy to distribute controlled substances.

2. Evidence of user attribution showing who used or owned the target device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, third party application data and browsing history.

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

BIG STONE GAP DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE SEARCH OF STORED ELECTRONIC DATA CONTAINED IN A BLACK FLIP PHONE, BELONGING TO ROBERT WARR, (PRESENTLY IN THE POSSESSION OF THE LEE COUNTY SHERIFF'S OFFICE) | **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Stephen Levesque, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for stored electronic data contained in a Black Flip Phone (hereinafter known as "the target device"), seized from the possession of Robert WARR ("WARR"). Agents with the Southwest Virginia Drug Task Force in Big Stone Gap, VA seized the target device from WARR after conducting a controlled purchase from Billy KING on July 27, 2022. WARR, who was in the vehicle with KING, was arrested by agents at that time. WARR is now under further investigation for conspiracy to distribute Schedule I and II controlled substances (Heroin and Methamphetamines). The device is currently in the custody Lee County Sheriff's Office, located in the Western District of Virginia.

2. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been employed since 2007. I received my training at the Federal Law Enforcement Training Center (FLETC) and ATF National Academy in

Brunswick, Georgia. At the ATF National Academy, we trained in various investigative techniques to include preparing a proper search warrant. During my training at FLETC and the ATF National Academy I received specialized training in the Controlled Substances Act, Title 21, United States Code, including, but not limited to Sections 841 (a)(1).

3. Prior to my ATF training, I received a Bachelor of Science Degree in Criminal Justice from Radford University (2004) and a Master of Science Degree in Criminal Justice and Police Studies from Eastern Kentucky University (2006). I have successfully completed a basic law enforcement academy with the Newport News Virginia Police Department (2006).

4. I am an investigative law enforcement officer of the United States within the meaning of Title 18 United States Code Section 3051. I am empowered by law to conduct investigations, seize evidence, and make arrests for violations of criminal statutes of the United States.

5. During my tenure in law enforcement, I have become familiar with the methods and techniques associated with the distribution of controlled substances, the laundering of drug proceeds and the organization of drug conspiracies and drug trafficking organizations. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing confidential sources and cooperating witnesses; conducting physical surveillance; controlled buys; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register data; requesting, collecting and analyzing billing records; and conducting court-authorized electronic surveillance.

Further, I have participated in the preparation, presentation, and execution of numerous search and arrest warrants which have resulted in the recovery of weapons, controlled substances, money, and documentary evidence indicative of firearm and drug trafficking activity. Additionally, I have assisted in investigations and arrests leading to convictions for violations of federal and state firearms and controlled substance laws.

6. Through instruction and participation in investigations, I have become familiar with the manner and methods by which controlled substance traffickers conduct their illegal business and the language and terms that are used to disguise conversations about their illicit activities. From experience and training, I have learned, among other things, that in conversations which controlled substance traffickers believe susceptible to interception, they virtually never expressly refer to the illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts in this affidavit are true and accurate to the best of my knowledge and belief as of the date of this affidavit.

8. Based on my training and experience and the facts, as set forth in this affidavit, there is probable cause to believe that WARR and his co-conspirators (both known and unknown) have committed the following violations: conspiracy to distribute and to possess with intent to distribute Heroin (a scheduled I controlled substance) and Methamphetamine (a

scheduled II controlled substance), in violation of Title 21 U.S.C. § 846 and § 841(a). There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as described in Attachment B.

## **PROBABLE CAUSE**

9. On May 12, 2022, agents from the Southwest Virginia Drug Task Force (DTF), utilizing an undercover (UC) agent[1], executed a controlled narcotics purchase from Billy KING and Billie MCGUIRE in Lee County, VA. The controlled narcotics purchase was video, and audio recorded. KING sold the UC agent two ounces of Crystal Methamphetamine (ICE) and eight grams of Heroin. A state lab later analyzed and confirmed the substance to be 51.38 grams of material found to contain Methamphetamine, and 8.3 grams of a material found to contain HEROIN.

10. On June 2, 2022, agents from the Southwest Virginia DTF, utilizing the same UC agent, executed a controlled narcotics and firearm purchase from Billy KING in Lee County, VA. The controlled narcotics purchase was video, and audio recorded. KING sold the UC agent two ounces of ICE and four firearms, including one revolver and three rifles. Agents later determined the revolver KING sold the UC agent had been reported stolen in May 2022 from a UPS shipping facility in Knoxville, TN.

11. On July 26, 2022, agents from the Southwest Virginia DTF, utilizing the same UC agent, executed a controlled narcotics purchase from Billy KING in Lee County, VA. The controlled narcotics purchase was video, and audio recorded. Prior to the controlled purchase, KING said his supplier would not "front" him the drugs. Your affiant knows from training and experience that "fronting" is a term used by drug traffickers to mean providing drugs to a drug dealer up front without initial payment, in order to allow the dealer to then sell the drugs, thereby making money to pay back the distributor. KING

---

[1] The UC assigned to the Southwest Virginia Drug Task Force is identified by his initials LM. LM's full identification is protected in this affidavit so as not to reveal information that may jeopardize ongoing investigative activity.

arrived at the designated meeting point with three additional individuals in his vehicle, later identified as Billie MCGUIRE, Robert WARR and Robert JENKINS. KING sold the UC agent two ounces of Heroin and one ounce of ICE. KING, MCGUIRE, WARR and JENKINS were each arrested following the controlled purchase. WARR was sitting in the front passenger seat of the vehicle upon his arrest. WARR had in his possession two phones, a flip phone (Target device,) and a Black I-Phone. There was an additional flip phone next to WARR in the front passenger door pocket.

12. On July 26, 2022, ATF SA Levesque and ATF Task Force Officer Mullins interviewed Billy KING at the Lee County Sheriff's Office. KING was advised of his rights and agreed to speak with law enforcement. KING stated that he knew Robert WARR as "Bird," and that he had met WARR approximately 6-8 months prior. KING stated he was introduced to WARR and JENKINS for the sole purpose to sell their narcotics, specifically Heroin. KING told investigators that WARR and JENKINS are from Detroit, MI and that they did not know any drug users in Knoxville, TN. KING explained that WARR and JENKINS wanted to use KING'S "customers" to distribute their Heroin. "They needed a face" to help sell their drugs, according to KING. KING agreed, because he would also be making money from the sales.

13. According to KING, WARR and JENKINS started traveling from Detroit to Knoxville once a week to sell their Heroin. KING told investigators WARR would text KING when they were coming into town. KING told investigators WARR used several phone numbers, including 313-675-8856 and 865-272-8260. KING estimated WARR and JENKINS were bringing 4-6 ounces of Heroin each time they came down from Detroit. KING said it was consistently once a week for the last 6-8 months.

14. Regarding the controlled purchase with the UC agent earlier that day (7-26-22). KING said WARR would not front him the two ounces of Heroin because he did not trust KING anymore. According to KING, KING owed WARR several thousand dollars. WARR and JENKINS agreed to travel with KING and MCGUIRE to Virginia to sell their Heroin. According to KING, WARR also supplied the ounce of ICE KING sold the UC agent. According to KING, WARR handed KING both the ICE and Heroin when they pulled into the parking lot.

15. After giving agents consent to look through his phones, KING said the text message conversations between WARR and him would not detail their drug distribution activity. KING explained that he and WARR had an understanding that did not need to be typed out in a text message. If WARR said he was coming to town, KING understood that WARR was coming to Knoxville and would have an amount of Heroin that needed to be sold.

16. On August 17, 2022, ATF SA Levesque and DTF Agent Coleman interviewed Billie MCGUIRE at the Lee County Sheriff's Office. MCGUIRE is represented by legal counsel and requested to speak with law enforcement. MCGUIRE's counsel was present during this interview. According to MCGUIRE, MCGUIRE was previously arrested on March 18, 2022, in Knox County, TN, following a domestic incident with her husband, Billy KING. According to MCGUIRE, KING met "BIRD" (known to agents as Robert WARR) while MCGUIRE was in jail. According to MCGUIRE, WARR needed someone (KING) to sell his product (Heroin). According to MCGUIRE, KING started selling Heroin for WARR.

17. According to MCGUIRE, KING and MCGUIRE were in a hotel in Michigan in April 2022 when WARR came to their hotel room and fronted them five ounces of Heroin. According to MCGUIRE, this was the first Heroin MCGUIRE personally saw WARR supply. KING and MCGUIRE then traveled back to Knoxville, TN with the five ounces of Heroin fronted by WARR. They sold the Heroin to their customers (users) and started to repay WARR.

18. According to MCGUIRE, WARR brought the second supply of Heroin to KING and MCGUIRE in Knoxville around the first of May 2022. On this occasion, WARR travelled alone and brought three ounces of Heroin, giving it to KING and MCGUIRE to sell. According to MCGUIRE, KING and MCGUIRE then sold the Heroin.

19. According to MCGUIRE, from June 9, 2022, to July 27, 2022, WARR and JENKINS would travel down to Knoxville in order to pick up KING and MCGUIRE. WARR and JENKINS would then accompany KING and MCGUIRE when they sold the Heroin. MCGUIRE explained that KING always drove because he knew the area. KING and MCGUIRE would call their customers and meet them in town. WARR and/or JENKINS would hand the Heroin to KING and/or MCGUIRE. According to MCGUIRE, the customer would come to their vehicle and make a hand-to-hand transaction with KING or MCGUIRE through the window. According to MCGUIRE, most people were buying half grams and grams of Heroin. WARR and JENKINS wanted $40 for each half-gram, and $80 for each gram of Heroin sold. KING and MCGUIRE were selling half-grams for $60, and grams for $120. MCGUIRE estimated she and KING sold approximately 4 grams of WARR's and JENKIN's Heroin every day. MCGUIRE believes, from what she

observed and heard, that WARR and JENKINS were bringing approximately five ounces of Heroin to TN each time they came from Detroit.

20. Your affiant's investigation determined WARR uses two cellular devices to communicate with KING. MCGUIRE told agents that both of WARR's telephone numbers were saved in KING's phone under the contact name "Bird." During a consensual review of KING's telephone, KING had two separate phone numbers saved in his contacts under the contact name "Bird" (whom law enforcement know to be WARR). These numbers were listed as follows: 313-675-8856 and 865-272-8260. WARR also told agents on 7/26/2022 that his cell phone number was 313-675-8856. Finally, at the time of his arrest, WARR was found to have two separate cellular telephones in his possession. Based upon this information, probable cause exists to believe each of these phones will contain evidence of communications between WARR and KING that may provide further details of dates, times, and communications about drug trafficking activity.

21. On the day MCGUIRE was arrested with WARR, KING, and JENKINS (7/26/22), she said they stopped along the way for WARR to purchase a container of "Daily Fiber", a granular commercial fiber supplement that is brown in color. WARR said he was going to help KING and MCGUIRE. WARR took six grams of Heroin out of the two ounces (intended for the UC Agent) and replaced it with six grams of the Daily Fiber. When they arrived at the Park and Ride in Jonesville, VA, WARR handed KING the two ounces of Heroin (which had six grams of Daily Fiber mixed in) and one ounce of ICE.

## WIRELESS TELEPHONES

22. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. The current generation of "smartphones" also provides the capability to employ Third Party Applications (apps) to provide additional messaging, voice communication, and media capabilities. The aforementioned data can also be located on a device contained within these apps.

23. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes

described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when/where the device was used. There is probable cause to believe that this forensic electronic evidence might be on cellular telephones seized because data on the device can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

24. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or wireless telephone is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

25. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with this application. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27. Based on the forgoing, I request that the Court issue the proposed search warrant. This Court, the United States District Court for the Western District of Virginia, has jurisdiction to issue the requested warrant pursuant to 18 U.S.C. § 3102 and Rule 41 of the Federal Rules of Criminal Procedure.

## REQUEST FOR SEALING

28. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal

these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

*Stephen* (signature)

Special Agent Stephen Levesque
Bureau of Alcohol, Tobacco, Firearms, and Explosives
United States Department of Justice

Subscribed and sworn to on August 25, 2022

*Pamela Meade Sargent* (signature)

HONORABLE JUDGE PAMELA MEADE SARGENT
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF VIRGINIA

Affidavit Reviewed by AUSA D. Murphy (//s// djm)